49. On April 19, 2018, A.S. wired $500,000 to COMMUNICLIQUE's Bank of America account ending in 1899.

50. On May 31, 2018, POWERS sent A.S. an email, which stated the following, in part:

"…We're getting close…All of your extension will be returned by 06/15. I could still use $400k to close May…If no, no stress. I really appreciate everything you've done. You helped us through a tough couple of months. THANK YOU. I wont forget it. I'm going to make it worth it to you."

51. On June 1, 2018, A.S. wired $400,000 to COMMUNICLIQUE's Bank of America account ending in 1899.

52. On August 9, 2018, POWERS sent A.S. an email, which stated the following, in part:

"I cut down the staff and some expenses this week and I've got the burn[5] down to $850k for this month. Id like to ask to push the repayment of your $2M back to the end of August. I'd also like to ask for an additional $350k. I can add another 50,000 shares if you can make those two requests work for you. I can cover the remaining $500k."

53. On August 13, 2018, A.S. wired $350,000 to COMMUNICLIQUE's Bank of America account ending in 1899.

**Investor J.S.**

54. Investor J.S. resides in New York. J.S. was interviewed by the FBI and provided the following information: J.S. met POWERS through a colleague. J.S. understood that POWERS needed money for an acquisition of some companies he was acquiring.

55. On December 26, 2018, POWERS sent J.S. a message through LinkedIn, which stated the following, in part:

"We're driving towards a close of the first target on this list (project name SAGAS attached). We need $2M to make the downpayment and I've got $1.6M secured. Would you be willing to personally make a $100k bridge investment for a 25% discount on the priced round (coming early February)…I have until Friday to complete this transaction."

---

[5] Based on the context of this email and my knowledge of the case terminology, I believe "burn" to mean cash spent or expenses for the month.

56. Attached to this message was a document titled "Sagas 11_2018," which contained information on three companies that POWERS was supposedly going to acquire. J.S. and POWERS had a phone conversation the following day, December 27, 2018, and POWERS then followed up with an email, to which J.S. replied and asked POWERS for the financials. POWERS replied with two attachments titled "Clique 2017 P and L" and Clique pandl July18." The 2017 P&L covered January through December 2017 and showed total income of $167,606,879. The 2018 P&L covered January through July 2018 and showed total income of $127,611.533.

57. Based on the information he was told and the information he was provided in writing, on December 28, 2018, J.S. wired $50,000 from his wife's Citibank account to a Wells Fargo account in the name of CLIQUE COMMUNICATIONS LLC ending in 7227. Based on the signature card for this account, POWERS is the only authorized signer. The balance of account 7227 prior to J.S.'s $50,000 wire was $4.23. That same day, December 28, 2018, POWERS transferred $45,000 to his personal Wells Fargo account ending in 3063, which had a balance of $204.18 prior to the $45,000 transfer. POWERS then used that money to purchase a cashier's check from account 3063 for $34,950, which was used to pay his monthly rent payment for his home in Pacific Palisades, California.

58. Just one week prior to J.S.'s investment, on December 18, 2018, POWERS was interviewed by the FBI. During the interview, I explained to POWERS that making false representations to someone for the purpose of obtaining money is fraud.

### V.   Virginia State Corporation Commission

59. On or around November 28, 2016, POWERS became aware of an inquiry into COMMUNICLIQUE being conducted by the VSCC, when the VSCC sent out a Request for Information. On March 7, 2017, an investigator from the VSCC interviewed POWERS

16

telephonically, and during the interview, POWERS stated that COMMUNICLIQUE had about 3,000 customers including FedEx, Wilmer Hale, NBA, Dell, and Staples. POWERS also told the VSCC that his company employed about 100 people plus 200 contractors. I interviewed over ten people that worked for COMMUNICLIQUE, and the general consensus was that there were between 10 to 20 employees on the payroll at a given time. In fact, one of the employees recalled conducting an employee census in early 2018 in order to set up a payroll provider, and there were around 20 paid employees at that time.

60. On March 10, 2017, an attorney representing COMMUNICLIQUE in this matter sent an email to the VSCC on behalf of COMMUNICLIQUE, which stated the following, in part:

"…On behalf of CommuniClique, Inc…I am writing to follow up on certain matters discussed during the conference call earlier this week…The contact information for the accountants from whom the Company has obtained services is as follows:

Joseph Burdett
Burdett & Associates
[Address]
Jessup, MD 20794

Sandra Jackson
[Address]
Baltimore, MD 21217

If you would like to speak to either of these individuals, please let me know, and the Company will be happy to arrange it."

61. I interviewed both of these individuals, who supposedly provided accounting services for COMMUNICLIQUE, and the first individual, Joseph Burdett, after looking through his records, advised that his last billing to COMMUNICLIQUE was in 2006 and has not spoken to POWERS since then. The other individual, Sandra Jackson, was not at all familiar with POWERS or COMMUNICLIQUE. Joseph Burdett's name was also listed as the CFO on one of the one-page executive summaries that went out to numerous investors.

62. On November 29, 2017, a different lawyer and law firm representing COMMUNICLIQUE in the matter, sent an email to the VSCC, which stated the following, in part:

> "...CommuniClique has not received any new outside shareholders since June 10, 2016. The issuances after June 2016 were based on the exercise of warrants for employee and executive compensation. For the time being, the company has put new capital raising efforts on hold as a result of the Division's investigation..."

63. A review of bank records, as well as interviews of multiple investors, has revealed that the statement above is not accurate. In fact, from June 10, 2016, to the date of the email above, COMMUNICLIQUE raised approximately $6,965,257.56 from nearly 20 investors, which were not all employees or executives of the company. In what appears to be an attempt to conceal the fact that he was raising funds after June 10, 2016, the subscription agreements for the investors who invested in COMMUNICLIQUE after June 10, 2016, have a date of June 10, 2016, or earlier, even though they wired their funds well after that date. Based on investor interviews, I have learned that POWERS' explanation for the date of June 10, 2016, or earlier, on the subscription agreements for people who were investing after that date was that it had to do with the share price and valuation of the company. For example, investor J.D. invested over $1 million in December 2016, but POWERS told him the subscription agreement needed to be backdated to June 10, 2016. By December 2016, POWERS was aware of the VSCC inquiry. As another example, investor W.J. wired approximately $100,000 in September 2017; however, his subscription agreement was dated June 10, 2016.

64. On August 30, 2018, a Judgment Order was entered through the VSCC ordering that the Defendants, COMMUNICLIQUE and POWERS, pay restitution of $9,890,293 to investors and pay civil penalties of $1,080,000, among other fines. As of the date of this affidavit, POWERS has not made any of these payments.

65.     On or about October 24, 2018, POWERS made a blog post on his website, www.andypowers.com, titled "I Screwed Up," which stated the following:

> "I screwed up. I misled investors about our business model and the quality of our earnings. In 2006 when I started Clique, I engaged with mostly unsophisticated investors. They wrote small checks primarily to make themselves feel rich and like they had a part in something sophisticated that had the potential to make them actually rich. I took advantage of them, and I'm sorry that I wasted their time. Some of these people I would consider friends who I care about, and who care about my family and me. However, most are not.
>
> You can read about the results of the investigation from the State of VA here. We chose not to contest the lawsuit. This was a civil case – not a criminal one – and it's now closed. No one is going to jail. I'm working to rescind and fully repay the investors, as well as pay the fines assessed by the State of VA. We will have this behind us very soon, and the company is moving forward."

66.     POWERS did, in fact, offer to buy back investor's shares; however, to my knowledge, as of the date of this affidavit, none of the investors have been able to successfully sell their shares back. In response to one of the investors following up with POWERS after trying to get repaid on a loan that had matured months before, POWERS responded with the following:

> "If you want to get on the other side me, feel free. Ask the State of Virginia how easy thats been. I'm prioritizing you, But you can be put at the back of the line."

### 2015 GMC Yukon

67.     On September 21, 2015, investor J.G. wired $2,000,000 to COMMUNICLIQUE's Bank of America account ending in 2198. The account balance prior to this wire was $106.25. On the same day, September 21, 2015, POWERS transferred $250,000 from account 2198 to his personal Bank of America account ending in 5800. The balance of account 5800 prior to the $250,000 transfer was $6,303.97. On the same day, September 21, 2015, POWERS wired $75,308.64 to Patrick Auto Group, a car dealership located in Ashland, Virginia. A subpoena was issued to Patrick Auto Group, which revealed that the wire of $75,308.64 was used to purchase a 2015 GMC Yukon. The Vehicle Identification Number for the vehicle is 1GKS2JKJ6FR302190.

Surveillance was conducted at POWERS' residence in Pacific Palisades, California on November 29, 2018, and this vehicle was observed at the residence. Therefore, I believe this vehicle is currently in the Central District of Los Angeles.

## VI. Conclusion

68. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from at least in or about January 2011 to December 31, 2018, POWERS engaged in a scheme to defraud, and that on or about November 29, 2016, POWERS induced investor J.D. to travel from California to EDVA in the execution of the scheme to defraud J.D. of more than $5,000 in violation of Title 18 U.S.C. §2314.

69. Based on the information contained in this affidavit, there is probable cause to believe that the 2015 GMC Yukon described above constitutes or was derived from proceeds traceable to the interstate travel fraud scheme and is therefore subject to seizure and civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and subject to criminal forfeiture pursuant to 28 U.S.C. § 2461(c).

Respectfully submitted,

Jamie M. Vera
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on May 30, 2019

/s/
Michael S. Nachmanoff
United States Magistrate Judge

Honorable Michael S. Nachmanoff
United States Magistrate Judge